NOT FOR PUBLICATION                              [Dkt. Ent. 27]


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN VICINAGE


| | |
|---|---|
| BRETT A. SUNKETT,<br><br>          Plaintiff,<br><br>     v.<br><br>NATIONAL GYPSUM COMPANY and<br>JOHN DOES (I-X),<br><br>          Defendants. | Civil No. 09-0721 (RMB/JS)<br><br>**OPINION** |

Appearances:

Daniel B. Zonies, Esq.
1011 Evesham Road, Suite A
Voorhees, NJ 08043

        Attorney for Plaintiff

Patricia A. Smith, Esq.
Ballard Spahr LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002

Geoffrey Daniel Bruen, Esq.
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

        Attorneys for Defendant

**BUMB**, UNITED STATES DISTRICT JUDGE:

        Plaintiff Brett A. Sunkett filed a Complaint in state court

alleging that his former employer, defendant NGC Industries, LLC

(improperly pled as "National Gypsum Company"; hereinafter "Defendant" or "NGC"), discriminated against him on the basis of age, race, and physical disability.  Specifically, Plaintiff claims Defendant refused to allow him to return to his position as forklift operator after taking a one-year disability leave offered to him by NGC.  Defendant removed the action to this Court, alleging diversity jurisdiction, since Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.  Defendant now moves for summary judgment.  NGC argues that it properly discharged Plaintiff after he concluded disability leave because he did not comply with its two-step procedure for reinstatement – (1) he failed to submit documentation from his treating physician stating that he was able to return to work, and (2) he did not receive clearance from the independent occupational medicine specialist who examines Defendant's employees to determine their fitness for duty.  NGC contends that it discharged Plaintiff for safety reasons, noting that the occupational specialist found Plaintiff unable to return to work because he could not safely perform the essential functions of his job without danger to himself or others.  For the reasons set forth below, Defendant's motion will be granted.

## I. BACKGROUND[1]

---

[1] All background facts are drawn from the parties' Rule 56.1 Statements of Material Fact and are construed in the light most favorable to Plaintiff.  See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).  The Court notes, however, that Plaintiff did not respond to Defendant's statement of material facts, as required by the Local Rules, and instead furnished only a "supplemental/counterstatement of material facts."  Local Rule 56.1 provides in relevant part:

Plaintiff worked for approximately 19 years at what is now the NGC facility in Delair, New Jersey.  (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1; Pl.'s Suppl. Statement of Material Facts ("SSMF") ¶ 14.)  He is African American and, at the time of his termination in 2006, was 44 years of age.  (Def.'s SUMF ¶ 2.)  Throughout his employment with Defendant, he worked as a forklift operator.  (Id. at ¶ 3.)  He had previously worked in essentially the same position for the Georgia Pacific Company, which owned the Delair facility until NGC purchased it in 2002.  (Id. at ¶ 4.)

On March 15, 2002, Plaintiff suffered an injury at work.  The trailer Plaintiff was unloading unexpectedly moved, causing his forklift to fall off of the loading dock.  (Def.'s SUMF ¶ 12.)  Plaintiff sustained various orthopedic injuries to his back, neck, and shoulders.  (Id. at ¶ 13.)  Although he was able to return to work soon after the accident with some limitations, in the years following, Plaintiff's physicians diagnosed him with multiple disc herniations in his spine, disc bulging and protrusion, chronic strain and sprain in his spine and myositis in his shoulder muscles, as well as segmental

---

The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement [of material facts not in dispute], indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

Thus, to the extent Plaintiff's "supplemental" statement does not dispute facts asserted by Defendant, those facts shall be deemed undisputed for purposes of this motion.  See Hill v. Algor, 85 F. Supp. 2d 391, 408 n.26 (D.N.J. 2000) ("[F]acts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.").

dysfunction, myalgia, muscle spasms and stiffness.  (<u>Id.</u> at ¶ 14.)

Between 2002 and 2005, Plaintiff regularly received treatment for his orthopedic complaints.  (<u>Id.</u> at ¶ 15.)  Although many of these treatments occurred during scheduled working hours, Defendant always accommodated Plaintiff by permitting him time off to attend them.  (<u>Id.</u> at ¶ 16.)  Defendant also permitted Plaintiff to take short-term leaves of absence, for days at a time, to obtain medical treatment for his orthopedic conditions and the pain they caused him.  (<u>Id.</u> at ¶ 21.)  Defendant also provided, at Plaintiff's request, other types of accommodations to permit him to remain employed.  For example, Defendant permitted Plaintiff to work with significant restrictions on the weight he was required to lift, push and pull, including a restriction prohibiting Plaintiff from lifting more than 5 pounds as of May 13, 2004.  (<u>Id.</u> at ¶ 22.)  Defendant also accommodated a requested prohibition on overtime work as well as certain tasks, such as digging and shoveling.  (<u>Id.</u> at ¶ 22.)

By March 2005, however, despite the medical interventions he had received and the workplace accommodations he had been provided, Plaintiff's back, neck, and shoulder complaints had intensified.  (<u>Id.</u> at ¶ 23.)  On March 9, 2005, he met with the facility's Human Resources/Safety Manager to discuss his medical situation.  (<u>Id.</u> at ¶ 23.)  As a result of that meeting, Plaintiff submitted a Request for Accommodation form, in which he stated that his medical conditions prevented him from fully performing certain job functions, including

4

"shoveling, digging, [] heavy lifting and operating [the] forklift for extended length[s] of time." (Def.'s Ex. V; Def.'s SUMF ¶ 24.) When asked how long he expected his medical condition to limit his abilities to perform those functions, he replied "unknown." (See id.)

In support of his request for a leave of absence, Plaintiff also submitted a completed Medical Certification of Fitness for Duty, prepared by his treating chiropractic physician, Barry Ryan, D.C. (Def.'s SUMF ¶ 25.) Dr. Ryan advised that Plaintiff could not perform many of the essential functions of his position, including shoveling, raking, digging, lifting more than 35 pounds, and engaging in more than one to two hours of continuous forklift operation. (Defs.' SUMF ¶ 25.) He further opined that there was a "substantial likelihood" Plaintiff would suffer aggravation of his existing medical condition if he continued to perform his job functions. (Id.)

Plaintiff had been receiving epidural injections from Dr. Barry Gleimer, his orthopedic surgeon, in an attempt to reduce the pain he felt in his back. (Def.'s SUMF ¶ 27; Padula Dep. 11:8-18, Def's Ex. X; Letter from Padula, Oct. 17, 2005, Def.'s Ex. Y.) In a deposition taken in a personal injury lawsuit Plaintiff filed against the company whose truck was involved in his 2002 forklift accident, Plaintiff testified that these injections helped for a period of time but ultimately gave him no relief. (Def.'s SUMF ¶ 27; Pl.'s Dep. 64, Def.'s Ex. Z.)

Given Plaintiff's inability to perform his job as a forklift operator, he commenced a one-year medical leave of absence on August 25, 2005. (Def.'s SUMF ¶ 28.) During his leave, he continued to treat with Dr. Gleimer, who referred him for pain management and chiropractic treatment. (Id. at ¶ 29.) Plaintiff also treated with Dr. Padula, a pain management specialist, who administered a series of injections in an attempt to reduce his pain. (Id.) In a letter dated October 17, 2005, Dr. Padula described Plaintiff's symptoms as follows:

> [Plaintiff] characterizes his neck pain as a constant dull aching sensation with a sharp and shooting sensation into the bilateral shoulder areas. The pain is exacerbated by using his upper extremities or lifting anything.

(Padula Letter to Dr. Gleimer, Oct. 17, 2005, Def.'s Ex. Y.)

Plaintiff also regularly visited Doctors Calzaretto and Ryan for chiropractic treatment. (Def.'s SUMF ¶ 29.) By December 2005, Plaintiff's conditions had not improved. Dr. Steven Klein, one of Plaintiff's treating orthopedic doctors, completed a "Clinical Assessment of Pain" form, which described Plaintiff's symptoms as follows:

- Pain is profound and intractable; it virtually incapacitates this individual;

- Increase of pain to such a degree as to require increased medication for pain or substantial amounts of bed rest;

- Medication will place severe limitations on the patient's ability to perform even the most simple everyday tasks;

- Patient will be totally restricted and thus unable to function at productive level of work;

6

- Little improvement is likely in this case; in fact, the pain is likely to increase with time;

- Treatments of this kind have had no appreciable impact or have only briefly altered the level of pain that this patient experiences.

(Def.'s SUMF ¶ 30.)  This form also noted that, at most, Plaintiff could only sit for an hour at a time or 1 to 2 hours total during an 8-hour workday.  It noted that, at most, Plaintiff could only stand and/or walk for an hour at a time or 1 to 2 hours total during the course of an 8-hour workday.  (Def.'s SUMF ¶ 31.)  Dr. Klein noted at the bottom of the form that Plaintiff "is unable to drive longer than 20 minutes and needs to rest at least 25-30 minutes."  (Id.)

Defendant has a policy of maintaining the employment status of individuals by providing extensive leaves of absence to employees who are unable to work due to illness or injury.  (Def.'s SUMF ¶ 32; Cody Cert., Def.'s Ex. B ¶ 5.)  Thereafter, Defendant assesses whether the individual will be able to return to work with or without reasonable accommodation.  (Def.'s SUMF ¶ 32; Cody Cert., Def.'s Ex. B ¶ 5, 7.) Plaintiff was permitted a 12-month medical leave of absence, even though the collective bargaining agreement which had established this benefit was no longer in effect in August 2006, when Plaintiff sought to return to work.  (Def.'s SUMF ¶ 33.)

Shortly before his 12-month leave was set to expire on August 25, 2006, Plaintiff sought to return to work.  (Def.'s SUMF ¶ 34.) Consistent with Defendant's normal policy, Plaintiff was required to satisfy two steps in order to return to work at the end of the 12-month

7

leave period.  (Id.)  First, Plaintiff had to obtain and submit documentation from his treating physician that he was able to return to work.  (Id.)  Second, Plaintiff was required to undergo a return-to-work/fitness-for-duty evaluation at Worknet Occupational Health,[1] the office that handled Defendant's post-offer and return-to-work physicals.  (Id.)  These examinations were required to ensure the safety of the affected employee and his co-workers and to determine whether the employee could perform the essential functions of the position with or without reasonable accommodation. (Id. at ¶ 35; Cody Cert. ¶ 7, Def.'s Ex. B.)

Once Plaintiff contacted Defendant and expressed his desire to return to work, he was scheduled for his fitness-for-duty evaluation. (Def.'s ¶ 36.)  On August 24, 2006, Dr. Lucian Introcaso conducted this examination at Worknet.  (Id.; Fitness for Duty Evaluation, Def.'s Ex. FF.)  Dr. Introcaso is a medical doctor who is board certified in occupational medicine and has been practicing in this field for over 15 years.  (Def.'s SUMF ¶ 36; Introcaso Dep., Def.'s Ex. S 6:12-16.)  Dr. Introcaso's evaluation confirmed that Plaintiff had been out of work for approximately one year due to back, neck and shoulder pain and that he had received multiple medical treatments, including epidural injections, chiropractic care for herniated discs and other osteopathic injuries.  (Def.'s SUMF ¶ 37; Introcaso Dep.

---

[1] Dr. Introcaso testified that at the time of Plaintiff's fitness-for-duty exam, "Worknet had taken over from Cooper Occupational Health."  (Introcaso Dep. 11, Def.'s Ex. S.)  For the sake of clarity, then, the Court will refer to the office that performed the fitness-for-duty evaluation as Worknet rather than Cooper Occupational Health.

11:8-12:25, Def.'s Ex. S; Fitness for Duty Evaluation, Def.'s Ex. FF.)

Dr. Introcaso and Worknet medical staff asked Plaintiff about his conditions and course of treatment and learned that Plaintiff was taking the narcotic Vicoprofen for pain.[2]  (Def.'s SUMF ¶ 37; Introcaso Dep. 13:5-11, 22:4-17.)  Regarding Plaintiff's medical history, Dr. Introcaso noted that Plaintiff informed he had been out of work "long term" and had "applied for long term disability." (Introcaso Dep. 13:5-11; 13:23-14:1; Fitness for Duty Evaluation, Def.'s Ex. FF.)  Dr. Introcaso's notes further reflect that he examined Plaintiff, finding that he had "full range of motion of the lumbar spine," deep tendon reflexes that were "two plus symmetrical," a "negative straight leg raise," and tenderness over his lower neck. (Introcaso Dep. 14.)[3]  Dr. Introcaso's evaluation also shows that he reviewed Plaintiff's treatment records and MRI's to assess Plaintiff's disability risk.[4]  (Introcaso Dep. 14:13-16 (noting that

---

[2] Plaintiff mischaracterizes Dr. Introcaso's testimony as stating that he "did not obtain any information from plaintiff about the pain medication referenced in his return to work evaluation."  (Pl.'s SSMF ¶ 2 (citing Introcaso Dep. 12:23-13:11).) Dr. Introcaso stated that he determined Plaintiff was taking Vicoprofen, which would have been elicited from Plaintiff's medical history, and that he wrote "Vicoprofen" into the fitness for duty evaluation.  (Introcaso Dep. 12:23-13:22; 22:4-17.)

[3] Although Plaintiff points out that Dr. Introcaso did not specifically recall examining him, Plaintiff also concedes that Dr. Introcaso's notes reflect the results of his examination. (Def.'s Resp. to Pl.'s SSMF ¶ 6 (citing Introcaso Dep. 14:3-10, 17:13-14, Def.'s Ex. S; Fitness for Duty Eval., Ex. FF).)  Introcaso was able to describe his examination of Plaintiff based on his notes:

> [M]y note reflects . . . what the positive findings [of the exam] were. .
> . . We would have had him bend forward . . . so you have full range of motion
> of his lumbar spine.  We would have tapped on his reflexes of his knees, his
> biceps, triceps and backs of his heels to say they were symmetric and
> reactive.  Would have lifted his legs to see that he did, had a negative
> straight leg raise, and would have palpated over the back of his neck to
> determine that he was tender over that area at the back of his neck.

(Introcaso Dep. 17:14-18:3, Def.'s Ex. S.)

[4] Plaintiff notes that Dr. Introcaso "could not state with certainty that he

return-to-work evaluation states: "[n]eed to review treatment record and MRI's to assess amount of disability risk.  In parenthesis, "done," and then "cannot safely perform essential functions of the job without danger to self or others."); Introcaso Dep. 25, 29 (noting that after reviewing faxed medical records, Dr. Introcaso wrote "herniated discs, C7-T1, T1-2" in his evaluation); Introcaso Dep. 26 (noting that usual procedure would have been to review all medical records when they were received); Introcaso Dep. 56:20-57:23 (noting that Dr. Introcaso received a fax of Plaintiff's medical records from his treating pain management doctor the same day as his evaluation)).

Dr. Introcaso also reviewed Defendant's job description for the forklift operator position.  (Introcaso Dep. 32:9-22 (noting that Defendant faxed over Plaintiff's job description the day of Plaintiff's exam, and he would have reviewed it in his assessment).)

After interviewing and examining Plaintiff, reviewing his medical records and job description, Dr. Introcaso concluded that Plaintiff was unable to return to work because he could not "safely perform [the] essential functions of the job without danger to [him]self or others."  (Dr. Introcaso's Fitness for Duty Evaluation, Def.'s Ex. FF; Introcaso Dep. 35:5-11.)  Dr. Introcaso relied on:

---

reviewed any medical records in writing his report of August 24, 2006."  (Pl.'s Suppl. Statement of Material Facts ("SSMF") ¶ 1.)  However, Dr. Introcaso's deposition testimony, his evaluation notes, and even Plaintiff's own testimony all indicate that Dr. Introcaso did in fact review Plaintiff's medical records before concluding that he could not safely perform his job as forklift operator.  (See, infra, Introcaso Dep. 14:13-16, 22-23, 25-26, 29; Fitness for Duty Eval., Ex. FF; Pl.'s Dep. 73, 76, Def.'s Ex. A ("So [the Worknet doctor who evaluated me during the August 2006 visit] did say he was going to get all my medical records. . . and come back after lunch.").)  The Court thus finds Plaintiff's insinuation that Dr. Introcaso did not review his medical records wholly unsupported.

(1)   The fact that Plaintiff's pain required him to take the narcotic Vicoprofen, which reduces alertness and would thus preclude Plaintiff from performing safety sensitive jobs, such as operating a forklift[5]; and

(2)   The physical demands of the forklift operator position, which required occasional heavy lifting, bending, and stooping,[6] put him at "significant risk" of either worsening his disc herniations or causing degeneration in his neck[7];

(Introcaso Dep. 33-35, 82.)   Given that Plaintiff was treating with narcotics and his exam showed continued pain and tenderness in his neck, Dr. Introcaso was also concerned that if Plaintiff returned to work, he would risk worsening his condition and creating an additional disability.   (Introcaso Dep. 82:5-14, Def.'s Ex S.)

---

[5] Dr. Introcaso testified that "if [Plaintiff] was required to use the narcotic, Vicoprofen, for the pain, the risk of not being alert while doing a safety sensitive job of driving a forklift . . . was very likely to result in his hurting himself." (Introcaso Dep. 82:15-19.)

[6] Plaintiff cites to his former supervisor, David Cotton's testimony, to establish that his job duties (other than operating the forklift) included mowing the lawn, sweeping, shoveling snow, and spreading salt in the winter.   (Pl.'s SSMF ¶ 9 (citing Cotton Dep. 17:7-14).)   Notably, Plaintiff excludes the rest of Cotton's testimony on this subject, in which he stated that Plaintiff's job description also included "Numerous things.   I'm probably not even remembering them all."   (Cotton Dep. 18:11-14, Pl.'s Ex. 2, Dkt. Ent. 30-2.)   Moreover, Plaintiff does not contend that the duties would exclude bending or stooping, which were listed in his job description.   Nor does he cite to any medical evidence suggesting that these tasks would not injure him further.   In fact, Plaintiff himself indicated in his Request for Accommodation that his injuries prevented him from shoveling, digging, heavy lifting, or operating the forklift for an extended length of time.   (Request for Accommodation, Mar. 10, 2005, Def.'s Ex. V.)

[7] Plaintiff notes that Cotton estimated that the heaviest item Plaintiff would be required to lift was a propane tank that weighs "about 40 pounds", whereas Dr. Introcaso relied on a job description of the forklift operator position, which stated that he had to occasionally lift and carry more than 50 pounds.   (Pl.'s SSMF ¶ 7; Introcaso Dep. 33:3-4.) Plaintiff does not cite to any support for Cotton's estimate as to the weight of the propane tank.   Nor does he produce any medical evidence to suggest that the difference in weight is significant in light of Plaintiff's injuries.   In fact, Plaintiff's medical records, discussed above, suggest otherwise.   Plaintiff also points out that Cotton acknowledged that lifting the propane tanks could be done with assistance.   (Pl.'s SSMF ¶ 7.) However, Plaintiff ignores that Cotton qualified this comment, noting that while it may be theoretically possible, he had never seen it happen and it would "tak[e] away two men from what they should be doing" rather than one.   (Pl.'s SSMF ¶ 7.) As discussed infra, Plaintiff never requested any such accommodation when he applied for his reinstatement, nor has he shown that he could have performed the job duties with such accommodation.

Plaintiff filled multiple prescriptions for Vicoprofen throughout 2006, including before, during, and after August 2006, the month he was dismissed from employment. (Def.'s SUMF ¶ 39.) In July and August 2006, Plaintiff obtained two 20-day supplies of 100 Vicoprofen pills each. (Id.)[8]

Plaintiff did not produce a medical release to return to work from his treating orthopedic physician, Dr. Barry Gleimer; in fact, Dr. Gleimer had recently determined in May 2006 that Plaintiff was unable to resume his position as forklift operator. (Def.'s SUMF ¶ 40.) Plaintiff instead obtained a physician's note from Dr. Vincent Padula, which stated in its entirety: "p[atien]t may return to work 8/24/06 100% percent". (Def.'s SUMF ¶ 41; Padula medical cert., Def.'s Ex. HH.) Dr. Padula was Plaintiff's pain management specialist who gave him various trigger point and epidural injections and prescribed his narcotic pain relievers, such as Vicoprofen. (Def.'s SUMF ¶ 42.) Dr. Padula testified that he did not recall whether he knew Plaintiff worked as a forklift operator at the time he wrote this note. (Padula Dep. 43:23-44:16, Def.'s Ex. X.) He did, however, acknowledge that when he prescribes narcotics to patients, he instructs them not to drive an automobile. (Padula Dep. 27:5-15.) He noted that patients taking narcotics should also refrain from

---

[8] Plaintiff points out that Dr. Introcaso acknowledged a narcotics prescription would not automatically disqualify him from returning to his job, because it depended on the frequency of the Vicoprofen usage. (Pl.'s SSMF ¶ 5.) Notably, however, Plaintiff does not dispute Dr. Introcaso's ultimate assessment that his treatment with Vicoprofen precluded him from operating a forklift. (Pl.'s Opp. Br. 14.) He does not contend that he was taking such limited amounts of Vicoprofen that he was still qualified for the forklift operator position. He has also not

operating heavy machinery, such as a forklift.  (Id.)  He conceded that "when it comes to a patient's . . . functional capacities, [he] usually . . . defer[s] to orthopedics, just because they're more knowledgeable about functional capacity."  (Padula Dep. 44:21-25.)

Notably, Plaintiff testified that he did not give Defendant Dr. Padula's note certifying that he could return to work.  (Pl.'s Dep. 72:20-73:4.)[9]  He testified that he gave it instead to Worknet.  Id. Defendant dismissed Plaintiff from employment on August 26, 2006, because: (1) Plaintiff failed to submit the required documentation from his treating physician clearing him to return to work, and (2) Dr. Introcaso certified that Plaintiff could not perform forklift duties without endangering himself or others.  (Def.'s SUMF ¶ 45.)

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.

---

disputed the fact that he filled 20-day prescriptions for Vicoprofen, totaling 200 pills, in July and August 2006.  (Def.'s SUMF ¶ 39.)
[9] Plaintiff's deposition states in relevant part:
    Q. So this note [from Dr. Padula certifying that he was able to return to work] was not presented to [Defendant]?
    A. I'm not sure.  It could have been.  I don't know.
    Q.  Let me rephrase it.  You did not present it to [Defendant]?
    A.  Exactly, yes.
(Pl.'s Dep. 72:20-73:1.)

13

at 250.  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, "the mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 249.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."

Anderson, 477 U.S. at 250 (internal citations and quotations omitted).  The non-movant's burden is rigorous:  it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); see Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010), cert. den'd, 131 S. Ct. 458 (2010).

### III. ANALYSIS

#### A.   New Jersey Law Against Discrimination Claims

##### 1. Disability Claim

The Court turns first to Plaintiff's claim of disability discrimination brought pursuant to the New Jersey Law Against Discrimination, N.J. Stat. Ann. 10:5-1 et seq. ("LAD"). Plaintiff does not identify the specific nature of his LAD claims in the Complaint.  Instead, he generally complains that Defendant's refusal to allow him to return to work violated the LAD, which "prohibits employment discrimination."  (Compl. ¶¶ 10-11.)  The parties appear to have interpreted this as a claim by a handicapped person for discriminatory discharge.  Accordingly, the Court addresses it as such.

New Jersey enacted the LAD in furtherance of the state's public policy "to eradicate invidious discrimination from the workplace." Carmona v. Resorts Int'l Hotel, Inc., 915 A.2d 518, 528 (N.J. 2007) (citations omitted).  It is unlawful "[f]or an employer, because of

15

the race . . . age . . . [or] disability . . . of any individual, ... to discharge" such a person "unless justified by lawful considerations . . . ." N.J. Stat. Ann. 10:5-12(a). The LAD "must be applied sensibly with due consideration to the interests of the employer, employee, and the public." Muller v. Exxon Research & Engineering Co., 786 A.2d 143, 147 (N.J. Super. Ct. 2001), cert. den'd, 798 A.2d 1269 (2002) (citing Jansen v. Food Circus Supermarkets, Inc., 541 A.2d 682 (N.J. 1988)). The LAD specifically does not "prevent the termination . . . of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment . . . ." N.J. Stat. Ann. 10:5-2.1. The LAD permits termination of an employee where "the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J. Stat. Ann. 10:5-4.1. Thus, "an employer found to have reasonably arrived at an opinion that a job applicant cannot do the job, either because the applicant is unqualified or because of a given handicap, cannot be found liable for discrimination against that applicant." Jansen, 541 A.2d at 687 (citing Anderson v. Exxon Co., USA, 446 A.2d 486, 496 (N.J. 1982)).

New Jersey courts have adopted the three-step, federal burden-shifting framework established in McDonnell Douglas v. Green, 411 U.S. 792 (1973), to assess discriminatory discharge claims under LAD. See Viscik v. Fowler Equipment Co., 800 A.2d 826, 833 (N.J.

2002); Peper v. Princeton Univ. Bd. of Trustees, 389 A.2d 465, 479 (N.J. 1978). New Jersey courts have repeatedly held, however, that the McDonnell Douglas test must not be rigidly applied.  Viscik, 800 A.2d at 833-34.  "The precise elements of a prima facie case must be tailored to the particular circumstances."  Id.  In situations involving the discriminatory discharge of a handicapped person, the plaintiff must first establish a prima facie case of discrimination by showing that:

> (1) He belongs to a protected class;
>
> (2) He was objectively qualified for his position, meaning he was actually performing the job prior to the termination;
>
> (3) He was nevertheless fired; and
>
> (4) The employer sought someone to perform the same work after he left.

See Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1143-44 (N.J. 2005); Viscik, 800 A.2d at 834 (N.J. 2002) (citing Clowes v. Terminix International, Inc., 538 A.2d 794 (1988)); Jansen, 541 A.2d at 692. After the plaintiff has established a prima facie case, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action.  See Viscik, 800 A.2d at 834; Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (citations and quotations omitted).  The defendant satisfies this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a

nondiscriminatory reason for the unfavorable action." Anderson, 621

F.3d at 271 (citations and quotations omitted).

> At the third step, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the defendant's explanation is pretextual. At this stage, a plaintiff may defeat a motion for summary judgment by either discrediting the defendant's proffered reasons or adducing evidence that discrimination was more likely than not a determinative cause of the adverse action.

Id. at 271. "The ultimate burden of persuasion that the employer

intentionally discriminated against the employee remains with the

employee at all times." Jansen, 541 A.2d at 691 (citations omitted).

Where the plaintiff is handicapped, however, the analysis

changes. He has the initial burden of proving, as part of his prima

facie case, that he can do the job. Jansen, 541 A.2d at 691 (citing

Anderson, 446 A.2d 486). Once he has established a prima facie case

of discrimination, "the employer's burden varies depending on whether

the employer seeks to establish the reasonableness of the otherwise

discriminatory act or advances a non-discriminatory reason for the

employee's discharge." Id. at 692. In the latter case, courts

adhere to the traditional McDonnell Douglas framework described

above, and the plaintiff maintains at all times the burden of proof,

even as the burden of production shifts. Id. In the former

scenario, however, where the employer asserts "that it reasonably

concluded that the handicap prevented the employee from working, the

burden of proof – as distinguished from the burden of production –

18

shifts to the employer to prove that it reasonably concluded that the employee's handicap precluded performance of the job." Id. "When asserting the safety defense, the employer must establish with a reasonable degree of certainty that it reasonably arrived at the opinion that the employee's handicap presented a materially enhanced risk of substantial harm in the workplace." Id. "[U]nder the safety defense, an employer's decision not to employee a handicapped person must be justified by a 'probability' rather than a 'possibility' of injury to the handicapped person or others." Jansen, 541 A.2d at 689.

Although Jansen does not discuss a third step of the analysis where the plaintiff is handicapped, the New Jersey Supreme Court in Anderson, 446 A.2d at 500, noted that the employee may respond to the employer's defense "by offering additional proofs to show that the employer did not reasonably arrive at its opinion." The Court stressed, however, "the employer retains the burden of proving that its opinion was reasonably founded." Id.

Here, the parties only dispute the second prong of the prima facie case – whether Plaintiff has established that he could objectively perform the position of forklift operator. In Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1143-44 (N.J. 2005), the New Jersey Supreme Court held that to satisfy the second prong, the plaintiff must "produce evidence showing that [he] was actually performing the job prior to the termination." Zive v. Stanley

Roberts, Inc., 867 A.2d 1133, 1143-44 (N.J. 2005).  Since Plaintiff
was on disability leave prior to the termination, the Court analyzes
this as a failure to hire or rehire claim.  Thus, Plaintiff must show
that he was objectively qualified to perform the job of forklift
operator, meaning that he met Defendant's legitimate expectations.
Jansen, 541 A.2d at 691-92.

Plaintiff points to two facts to show that he could perform the
job.  First, he cites to Dr. Padula's one-line note, which states:
"p[atien]t may return to work 8/24/06 100% percent".  (Def.'s SUMF
¶ 41; Padula medical cert., Def.'s Ex. HH.)  The record evidence,
however, does not support Plaintiff's position.  First, Dr. Padula's
assessment does not comport with Plaintiff's medical history,
described supra.  Second, the note was written not by Plaintiff's
treating orthopedic physician, Dr. Gleimer, but by his pain
management specialist, who admitted that he defers to orthopedics for
functional capacity.  Dr. Padula also conceded that he could not make
a determination as to how debilitating Plaintiff's pain was, because
pain is "a very subjective thing" that is "based on what the patient
is telling you."  (Padula Dep. 36:21-24, Pl.'s Ex. 3.)  As such, the
note bears not on Plaintiff's ability to perform the duties of
forklift operator, but on his ability to manage his pain according
to what he told Dr. Padula in seeking to obtain clearance to return
to work.  The fact that Dr. Padula could not recall whether he knew
Plaintiff was a forklift operator when he wrote the note also supports

20

this conclusion.  Dr. Padula even acknowledged that patients taking narcotics should not operate forklifts.  Finally, Plaintiff admitted that he did not give this note to Defendant, so they had no notice of Dr. Padula's opinion.

Second, Plaintiff argues that because he worked as forklift operator for three years between the 2002 accident and his disability leave in 2005, he could still perform the job after his leave in 2006. The Court finds this argument disingenuous.  Plaintiff requested disability leave precisely because despite the medical interventions he had received and the numerous workplace accommodations he had been provided, his back, neck, and shoulder problems had intensified to the point that he could not fully perform the duties of forklift operator.  See, supra, Part I.  In his Request for Accommodation form, which he submitted in March 2005, Plaintiff stated that his medical conditions precluded him from fully performing his job functions, including "shoveling, digging, [] heavy lifting and operating [the] forklift for extended length[s] of time."  (Def.'s Ex. V; Def.'s SUMF ¶ 24.)

Nevertheless, the Court acknowledges that the second prong presents a low hurdle.  See, e.g., Zive, 436 A.2d at 447 (noting that establishing the second prong of the prima facie test is "not a heavy burden").  The Court thus assumes, without deciding, that Plaintiff has shown that he could perform the job of forklift operator and thus

21

has established a <u>prima facie</u> case of discrimination.  The burden of proof therefore shifts to Defendant.  <u>Jansen</u>, 541 A.2d at 692.

To satisfy its burden, Defendant must show to a reasonable degree of certainty that Plaintiff's disability would probably cause injury to himself or others and preclude him from performing the duties of forklift operator.  <u>Id.</u>  In deciding this issue, the Court must consider whether Defendant consulted with its medical experts and considered the probability of injury before firing Plaintiff.  <u>Id.</u>

Defendant notes that it had a two-step policy in place to determine whether an employee on disability leave was able to return to work.  Importantly, it involved consultation with medical experts to determine the probability of injury.  The employee had to (1) obtain and submit documentation from his treating physician that he was able to return to work, and (2) receive clearance from an independent occupational medicine specialist at Worknet, the office that handled Defendant's post-offer and return-to-work physicals. The record is clear that Plaintiff did not satisfy either requirement.

The parties do not dispute that Defendant required the Worknet examination in order to ensure the safety of the affected employee and his co-workers and to determine whether the employee could perform the essential functions of the position with or without reasonable accommodation.  <u>See</u>, <u>supra</u>, Part I.  Defendant contends that it reasonably relied on the assessment provided by Worknet physician Dr.

22

Introcaso that Plaintiff could not perform the forklift operator duties without endangering himself or others.   Defendant cites to Dr. Introcaso's deposition testimony, his fitness for duty evaluation, and Plaintiff's own testimony and treatment records to support this assessment.

As discussed in detail above, Dr. Introcaso's evaluation confirmed that Plaintiff had been out of work for approximately one year due to back, neck and shoulder pain, that he had received multiple medical treatments, including epidural injections, chiropractic care for herniated discs and other osteopathic injuries, that he had been prescribed the narcotic Vicoprofen for pain, and that he had applied for long-term disability benefits.  See, supra, Part I.  Dr. Introcaso's notes reflect that he examined Plaintiff, finding among other things, that he had tenderness over his lower neck, which was consistent with his treatment with narcotics and epidural injections and indicated that returning to work would exacerbate his injuries. Id.  Dr. Introcaso reviewed Plaintiff's treatment records and MRI's to assess the disability risk.  He asked Plaintiff about his course of treatment with Vicoprofen and made a notation in his evaluation accordingly.  He examined Plaintiff's job description and was therefore aware of the type of work Plaintiff would be required to perform.  After interviewing and examining Plaintiff and reviewing his medical records and job description, Dr. Introcaso concluded that Plaintiff was unable to return to work because he could not safely

perform the essential functions of the job without danger to himself
or others.

He based this conclusion, in part, on the fact that Plaintiff's
continued pain required him to take Vicoprofen, which reduces
alertness and would thus preclude him from operating a forklift.   Dr.
Padula concurred that a patient taking Vicoprofen should not operate
a forklift.   Plaintiff argues that Dr. Introcaso should have inquired
further into his use of Vicoprofen, because some limited use of the
drug might not have affected his work.   Notably, however, Plaintiff
does not dispute Dr. Introcaso's ultimate assessment that his
Vicoprofen usage precluded him from returning to work.   Nor does he
proffer any evidence to the contrary.   Indeed, he has not contested
that at the time of his termination in July and August 2006, he was
taking Vicoprofen regularly and had filled two 100-pill prescriptions
for the narcotic.

Nevertheless, Defendant also notes that Dr. Introcaso's
conclusion relied on more than his assessment of Plaintiff's use of
narcotics.   His review of Plaintiff's medical records, the forklift
operator job description, and his physical examination of Plaintiff
also supported his determination.   In Dr. Introcaso's opinion,
Plaintiff's continued pain and tenderness in the neck combined with
the physical demands of the forklift position meant that Plaintiff's
return to work would put him at "serious risk" of worsening his

24

condition, causing disc herniations or degeneration.  Defendant further notes that Plaintiff's medical records support Dr. Introcaso's conclusion.  See, supra, Part I.

In light of this extensive record, the Court finds that Defendant has established with a "reasonable degree of certainty that it reasonably concluded that Plaintiff's disability presented a materially enhanced risk of substantial harm in the workplace." Jansen, 541 A.2d at 692.  First, Defendant was aware that Plaintiff had been on disability leave for an entire year due to his serious injuries.  Second, Plaintiff failed to submit any documentation from his treating physician, as required by company policy, demonstrating his ability to return to work.  Third, Defendant reasonably relied on Dr. Introcaso's independent assessment, described above, which was based on an examination, tailored to Plaintiff's injuries, a review of the relevant medical history, treating records and MRI's, and the job description.  Since Defendant has carried its burden at this stage, Plaintiff may now challenge this defense by offering additional proofs.

Plaintiff argues that Dr. Introcaso's report was "insufficient, if not a sham."  (Pl.'s Opp. Br. 11.)[10]  Plaintiff first argues that the job description relied on by Dr. Introcaso was old, but does not dispute its substance, i.e., that Plaintiff was required to "bend"

---

[10] The Court notes that Plaintiff's opposition brief [Dkt. Ent. 30] does not contain page numbers.  For ease of reference, the Court therefore cites to the respective page numbers listed in the docket notation at the top of the page.

and "lift" as part of his job duties.   He merely disputes the maximum weight he was required to lift (an amount that, according to the job description, occasionally exceeded 50 pounds).   He contends that according to Cotton's unsupported estimate, the heaviest item – a propane tank – was 40 pounds.   However, he has not established the actual weight of the propane tank or provided any support for Cotton's guess.   Such speculation cannot defeat summary judgment.   See, e.g., Lexington Ins. Co. v. Western Pa. Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (finding witness' testimony that she "touched on" matter at conference but had no specific recollection about it was too speculative to defeat summary judgment on issue of whether she had given notice to defendant at time of conference).   Moreover, Plaintiff has failed to establish the significance of this distinction.   He has not cited any medical evidence showing that he could lift even this lesser amount.   Thus, even if Plaintiff had supported Cotton's testimony that the heaviest item he was required to lift was 40 pounds, he has failed to show the probative value of this fact.

Next, Plaintiff cites to Cotton's testimony that Plaintiff only complained once about performing a job duty because of pain.   (Pl.'s Opp. Br. 12.)   This ignores the fact that subsequent to his time working with Cotton, Plaintiff's pain became so unmanageable that he

took an entire year of disability leave to seek treatment for this problem.  Cotton's assessment was therefore clearly outdated.

Plaintiff also submits that Dr. Introcaso's examination of him was "entirely defective" under Anderson v. Exxon Company, USA, 446 A.2d 486, 496 (N.J. 1982), because it "lacks the necessary depth required under New Jersey law to justify job disqualification." (Pl.'s Opp. Br. 12.)  The Court finds Plaintiff's reliance on Anderson misplaced.[11]  In Anderson, the orthopedic doctor who

---

[11] Although Plaintiff's argument does not rely on Jansen, the Court notes that this case is also distinguishable.  In Jansen, the employer fired the plaintiff, an epileptic, from his job as a butcher.  541 A.2d 682.  After suffering a seizure at work, the store manager told the plaintiff not to return without a doctor's letter of approval.  The plaintiff returned to work after producing a note from his treating neurologist stating that his seizures had been under fair control on medication, that he had increased the medication and expected to be able to achieve better seizure control in the future.  Id. at 685.  After the plaintiff's coworkers complained that they feared for their safety - as a result of certain statements made by the plaintiff - the employer arranged for medical examinations by a psychiatrist and a neurosurgeon.  Id. at 685.  The psychiatrist considered it "risky and dangerous" for someone with the plaintiff's neurological problems to work as a meat cutter.  Id.  The neurosurgeon determined that "such patients" with epilepsy "need to be protected, as well as other people, from the effects of such seizures," and "therefore any occupational activity [including the job of butcher] in which the patient might injure himself or others, were he to have a seizure, should be avoided."  Id. at 685-86.  Relying on these two doctor's reports, the employer terminated the plaintiff's employment.  The plaintiff subsequently obtained letters from three physicians certifying that given the specific circumstances of his condition, he could work as a meat cutter without endangering himself or others.  Id. at 686.  Nonetheless, the employer refused to reinstate him.  The trial court dismissed his claim for discrimination after trial, and the Appellate Division affirmed.  Id.  In reversing this decision, the New Jersey Supreme Court found that neither court below had addressed whether future seizures - even if their occurrence was reasonably probable - were actually likely to result in harm to the plaintiff or his co-employees.  Id. at 687.  The Supreme Court determined that the trial court erred by failing to distinguish between the risk of a future seizure and the risk of future injury, noting that "[t]he assumption that every epileptic who suffers a seizure is a danger to himself or to others reflects the prejudice that the [LAD] seeks to prevent."  Id. at 689 (citation omitted).  The Court cited to the plaintiff's medical experts who stated that "even if he were to suffer another seizure at work, it probably would not result in harm to him or others."  Id.  The Court concluded that "[i]n the absence of expert testimony linking the likelihood of a seizure to the likelihood of harm, the lower courts should not have assumed that [plaintiff] was unable to work as a meat cutter without materially enhancing the risk of harm to himself or others."  Id. at 689.  This case is distinguishable.  Here, the Defendant's decision to terminate Plaintiff relied on an individualized assessment of his back, neck, and shoulder

27

reviewed an applicant during a pre-employment medical examination rejected the plaintiff based on only two items: (1) the plaintiff's self reporting that he had had a back operation over ten years earlier, and (2) a basic physical exam wherein plaintiff had to raise his hands and bend over and touch his toes.  <u>Anderson</u>, 446 A.2d at 489.  The physician provided a cursory report in which he "marked the square on [plaintiff's] medical report indicating that the applicant had an abnormal spine and back, and that [plaintiff] was 'not recommended for employment.'"  <u>Id.</u> at 489.  The physician informed the plaintiff "he could not be hired because of his previous back operation and that people with back problems would not be hired."  <u>Id.</u>  Plaintiff challenged his disqualification, producing his treating orthopedic surgeon, who testified that Plaintiff had made a good recovery from his surgery, enabling him to resume strenuous delivery jobs for at least eight years prior to this.  <u>Id.</u> at 489.  The court found that the employer did not "reasonably arrive" at its opinion that the applicant could not do the job, noting that the physician's assessment on which it relied was "unreasonable and arbitrary."  <u>Id.</u> at 502.  The court also acknowledged, however:

---

injuries - which had already caused him to take a one-year leave for disability – and the probability that these injuries would cause further harm to Plaintiff and put the safety of others at risk.  Specifically, Dr. Introcaso's assessment concluded that Plaintiff faced a "significant risk" that the physical demands of the job would cause his disc herniations to worsen and lead to degeneration.  <u>See</u>, <u>supra</u>, Part I.  Additionally, he found that since Plaintiff's pain necessitated treatment with narcotics such as Vicoprofen, which reduces alertness, he would put others and himself at risk by resuming the safety sensitive job of forklift operator.  <u>Id.</u>  Unlike the employer in <u>Jansen</u>, here, the Defendant did not terminate Plaintiff merely because of his disability, but because his injuries would significantly increase the risk of harm to himself and others.

> The employer has the legal liberty to reject an applicant
> as long as it has reasonably arrived at its opinion that
> the applicant is unqualified for the job. . . .
>
> "[A]n employer who rejects a job applicant not because of
> his handicap per se but because of an opinion, reasonably
> arrived at, that the handicap precludes adequate job
> performance, cannot and should not be found in violation
> of the Law Against Discrimination." . . .
>
> Nothing in the court's decision precludes an employer from
> establishing that under appropriate circumstances
> reliance on an informed medical opinion justifies a
> decision to deny employment.

Anderson, 446 A.2d at 496, 502 (quoting Panettieri v. C.V. Hill

Refrigeration, 388 A.2d 630, 637-38 (N.J. Super. Ct. App. Div. 1978)).

Unlike the cursory examination in Anderson, Dr. Introcaso
conducted an in depth, individualized assessment of Plaintiff.  He
reviewed the relevant medical records and MRI's, and discussed
Plaintiff's history with him, including his treatment with narcotics.
Notably, Plaintiff informed him he was treating with Vicoprofen and
had applied for long-term disability benefits.  See, supra, Part I.
Dr. Introcaso then performed an examination focused on Plaintiff's
shoulder, neck, and back problems.  See, supra, Part I.  Although he
did not specifically recall giving this exam when he testified at his
deposition hearing more than three years later, Dr. Introcaso could
infer what the exam involved based on his notes:

> We would have had him bend forward . . . so you have full range
> of motion of his lumbar spine.  We would have tapped on his
> reflexes of his knees, his biceps, triceps and backs of his heels
> to say they were symmetric and reactive.  Would have lifted his
> legs to see that he did, had a negative straight leg raise, and
> would have palpated over the back of his neck to determine that
> he was tender over that area at the back of his neck.

(Introcaso Dep. 17:14-18:3, Def.'s Ex. S.)  Dr. Introcaso found that Plaintiff had "full range of motion of the lumbar spine," deep tendon reflexes that were "two plus symmetrical," a "negative straight leg raise," and tenderness over his lower neck.  Id.  This examination, which was tailored to Plaintiff's injuries, along with Dr. Introcaso's review of the relevant job description and Plaintiff's medical history, and his discussion with Plaintiff regarding his conditions, was a far cry from the cursory examination rejected by the court in Anderson.  See, supra, Part I.  The Court therefore dismisses this argument.

For the foregoing reasons, the Court finds that Defendant reasonably arrived at its decision to terminate Plaintiff.  No genuine dispute of material fact exists as to this matter.  Indeed, the record is devoid of any evidence of improper discrimination.  It is clear that Defendant's decision to discharge Plaintiff was based on its well-informed conclusion that he was incapable of performing the work and would endanger himself and others if given the position.  Defendant's motion for summary judgment is therefore granted.

2. <u>Failure-to-Accommodate Claim</u>

In his opposition papers, Plaintiff for the first time appears to assert a LAD claim for failure to accommodate his disability.  (Pl.'s Opp. Br. 14.)  Plaintiff argues that Defendant denied him a reasonable accommodation by failing to ask him if he wanted such an

accommodation when he sought reinstatement in August 2006.   Although Plaintiff's opposition papers do not operate to amend his Complaint, the Court notes, in an abundance of caution, that such an amendment would be futile for the following reasons.

Under the LAD, an employer "must make a reasonable accommodation to the limitations of a [handicapped] employee or applicant . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  N.J. Admin. Code 13:13-2.5(b); see also Potente v. Cnty. of Hudson, 900 A.2d 787, 791 (N.J. 2006); Mickens v. Lowe's Corp., Inc., Civ. No. 07-6148, 2009 WL 4911952, *3 (D.N.J. Dec. 14, 2009) (citing Soules v. Mt. Holiness Memorial Park, 808 A.2d 863 (N.J. Super. Ct. App. 2002).  New Jersey courts have recognized an interactive process of arriving at a reasonable accommodation for a disabled employee. Jones v. Aluminum Shapes, Inc., 772 A.2d 34, 41 (N.J. Super. Ct. App. Div. 2001).  A disabled employee can show that his employer failed to participate in this interactive process by demonstrating that:

(1)  The employer knew about the employee's disability;

(2)  The employee requested accommodation or assistance for his disability;

(3)  The employer did not make a good faith effort to assist the employee in seeking accommodation; and

(4)  The employee could have been reasonably accommodated but for the employer's lack of good faith.

Jones, 772 A.2d at 41 (emphasis added); Tynan v. Vicinage, 798 A.2d 648 (N.J. Super. Ct. App. Div. 2002).  The employee must make clear

31

that he wants assistance for his disability either by "direct
communication or other appropriate means."  Colwell v. Rite Aid
Corp., 602 F.3d 495, 506-07 (3d Cir. 2010) (citing Conneen v. MBNA
Am. Bank, N.A., 334 F.3d 318, 332 (3d Cir. 2003)).  "The employer must
have enough information to know of both the disability and desire for
an accommodation, or circumstances must at least be sufficient to
cause a reasonable employer to make appropriate inquiries about the
possible need for an accommodation."  Id.  The law does not require
any magic words to request an accommodation – indeed, it need not be
in writing or even use the phrase "reasonable accommodation" - the
employee must simply make clear that he desires assistance for his
disability.  Tynan, 798 A.2d at 657 (citations omitted); see also
Colwell, 602 F.3d at 506-07.

Here, Plaintiff neither pled reasonable accommodation nor
requested any such accommodation from Defendant, as the law requires.
See Viscik v. Fowler Equipment Co., 800 A.2d 826, 837 (N.J. 2002).
The record reflects that Plaintiff never indicated that he desired
such assistance in any way.  Indeed, Plaintiff does not even now claim
he wanted a reasonable accommodation at the time he requested
reinstatement or that he could have performed the duties of forklift
operator with such accommodation.  (Pl.'s Opp. Br. 14-15.)  He
merely argues that Defendant should have inquired into the matter.
Defendant, however, had no notice that Plaintiff sought such
assistance.  Since Plaintiff had never previously hesitated to

request such accommodations, and Defendant had always granted them, Defendant had no reason to think that Plaintiff would not express his desire for accommodation as he had done in the past.[12]   Accordingly, Defendant cannot now be faulted for failing to offer something, which Plaintiff never requested.

Furthermore, Defendant had no duty to offer a reasonable accommodation, since it properly determined that Plaintiff was physically unable to perform the duties of forklift operator, even with an accommodation.  See supra.

3. Race and Age Discrimination Claims

The Complaint also asserts claims for race and age discrimination under the LAD.  Defendant moves to dismiss these claims, arguing that Plaintiff has not produced any evidence showing that he was discharged due to his race or age.  Plaintiff did not oppose this motion and thus appears to have conceded Defendant's arguments.  Accordingly, the Court finds summary judgment appropriate and dismisses these claims.  See, e.g., Marley v. Cort Furniture Rental Corp., Civ. No. 06-4926, 2008 WL 4066345, *2 n.3 (D.N.J. Aug. 26, 2008) (granting unopposed summary judgment motion as to plaintiff's race discrimination claims for demotion and

---

[12] For the four years prior to Plaintiff's discharge, Plaintiff made numerous requests for accommodation, all of which Defendant granted.  Between 2002 and 2005, Defendant granted Plaintiff's request to seek medical treatment during working hours, even when such treatment required leaves of absence for days at a time.  See, supra, Part I.  At Plaintiff's request, Defendant permitted Plaintiff to work with significant restrictions on the weight he was required to lift, push and pull.  Defendant also accommodated a requested prohibition on overtime work as well as certain tasks, such as digging and shoveling.  Id.  Despite these accommodations, Plaintiff's back, neck, and shoulder complaints intensified, and in 2005, Defendant granted Plaintiff's request for a long-term leave of absence.  Id.

disparate pay).

### B. Workers' Compensation Retaliation Claim

Plaintiff also alleges that he was fired in retaliation for bringing a workers' compensation claim.  Defendant moves for summary judgment on this claim on the grounds that Plaintiff has not provided any support for it and has failed to establish the requisite causation between his workers' compensation claim and his discharge.  Indeed, Plaintiff testified that he did not recall whether he had made a workers' compensation claim.  (Pl.'s Dep. 198:3-8.)  When asked directly what facts supported this claim, he testified, "I'm not sure of the facts. . . . I just have some feeling towards me that I felt that was the reason."  (Pl.'s Dep. 202:7-13.)  Plaintiff did not oppose this motion, and the Court thus deems Defendant's arguments undisputed and summary judgment therefore appropriate.  See Marley, 2008 WL 4066345, *2 n.3.

### C. Evidentiary Issues

Plaintiff asserts that all of the exhibits submitted in support of Defendant's motion are inadmissible because they cannot be properly authenticated by counsel and are barred by the hearsay rule. (Pl.'s Opp. Br. 16.)[13]

---

[13] The Court notes that both parties originally filed exhibits in support of their motion papers without any declaration as to their authenticity or any description identifying their contents.  Plaintiff's exhibits, for example, were not labeled and consisted of unnamed deposition transcripts, which began in the middle of the deposition, lacked any cover page identifying the deponent or date, and lacked any declaration of authenticity.  The Court permitted the parties an opportunity to correct this error and properly authenticate their exhibits, which they did.  [Dkt.

1.   <u>Authentication</u>

Regarding the authentication issue, Plaintiff only excludes from his sweeping allegation his own deposition, the depositions of Dr. Calzaretto, Dr. Introcaso, and Dr. Padula, and the medical records produced by these doctors and authenticated by them in their depositions.  Notably, Plaintiff has not identified any specific exhibit or portion of an exhibit to which he objects.

Defendant helpfully provided a list of its exhibits, identifying the source and basis for authentication of each.  Since this Opinion relies only on one disputed exhibit - Exhibit V (a one-page "Request for Accommodation" form, which was purportedly completed and signed by Plaintiff on March 10, 2005) - the Court limits its analysis to that exhibit.

Defendant has satisfied the minimal requirements for authentication under Federal Rule of Evidence 901(a), which provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The Third Circuit has repeatedly stressed that "[t]he burden of proof for authentication is slight." <u>Lexington Ins. Co. v. Western Pa. Hosp.</u>, 423 F.3d 318, 328 (3d Cir. 2005) (quoting <u>McQueeney v. Wilmington Trust Co.</u>, 779 F.2d 916, 928 (3d Cir. 1985) and <u>Link v. Mercedes-Benz of N. Am.</u>, 788 F.2d 918, 927 (3d Cir. 1986)).  "All that

Ent. 26.]

is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." McQueeney, 779 F.2d at 928 (citations and quotations omitted).

> The showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility.  Rather, there need be only a prima facia showing, to the court, of authenticity, not a full argument on admissibility.

Lexington, 423 F.3d at 329 (emphasis in original) (quoting Link, 788 F.2d at 928).  Circumstantial evidence may suffice to authenticate a document.  McQueeney, 779 F.2d at 928.  For example, courts have found that the appearance, contents, and substance of a document tend to support its authenticity.  Id. (citing Fed. R. Evid. 901(b)(4) ("[a]ppearances, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances" may establish authenticity)).  The fact that a document was produced by the opposing side in response to an explicit discovery request also tends to prove the document's authenticity. McQueeney, 779 F.2d at 929 ("[T]he fact that the copies were produced by the plaintiff in answer to an explicit discovery request for his Sea Service Records, while not dispositive on the issue of authentication, is surely probative."); Burgess v. Premier Corp., 727 F.2d 826, 835-36 (9th Cir. 1984) (holding that evidence found in defendant's warehouse was adequately authenticated simply by its being found there).

36

The Court finds that Defendant has properly authenticated Exhibit V.  First, it has an official appearance.  Its heading reads:

### Request for Accommodation

#### (*To be completed by employee*)

The answers to the form questions indicate that Plaintiff filled it out himself.  In response to the first question, asking the applicant's name, the answer reads "Brett Sunkett".  Next, the applicant wrote that he works at the "Delair, NJ" facility, held the position of "Fork Lift Operator" and suffered from "BACK, NECK, SHOULDER AND HIP PAIN".  (Def.'s Ex. V (capitalization in original).) In response to a subsequent question asking the applicant to list the "specific functions, duties, or tasks" of his job, which he believed he could not do because of a medical condition, the applicant wrote: "SHOVELING, DIGGING AND HEAVY LIFTING AND OPERATING FORKLIFT FOR EXTENDED LENGTH OF TIME."  In response to the next question, asking how long the applicant expected this medical condition to limit his ability to fully perform his job, the applicant responded "UNKNOWN." The last question asked for suggestions that may enable or assist the applicant in performing the job functions with which he had difficulty.  The handwritten response reads: "AS LONG AS THESE INJURIES EXIST, I HAVE NO SUGGESTIONS.  No shoveling, digging, or heavy lifting."  Plaintiff's initials are written next to this sentence as "B$", with the "S" - presumably for "Sunkett" - written

as a dollar sign.   Plaintiff's signature and date are written on the last line of the form.

The appearance, substance, and content of this form reflect its authenticity.   Plaintiff's symptoms of pain and reported difficulty with the various duties of his job as listed on the form are consistent with the rest of the record.   See, supra, Part I.   Notably, Plaintiff produced this form to Defendant in discovery and has not provided the Court with any reason to question its authenticity. (Def.'s Reply Br. 3-9, Dkt. Ent. 33.)   Accordingly, the Court finds that there is a sufficient foundation for a jury to determine that this document is what it purports to be.   See McQueeney, 779 F.2d at 929 (circumstantial evidence easily established authenticity where document's contents supported such authenticity, opposing side had produced document in response to explicit discovery request for such records, and information in document was not widely held).

2.   Hearsay

Plaintiff's hearsay argument consists of one conclusory sentence: "the documents presented by defendant constitute hearsay, and often hearsay within hearsay." (Pl.'s Opp. Br. 16.)   Plaintiff has failed to identify the offending documents or cite to any specific instances of hearsay.   The Court will not expend its limited resources rooting about the case law and the parties' briefs to make Plaintiff's case for him.   See Reeves v. Mahoney, Civ. No. 09-2665,

38

2011 WL 883214, *5 (quoting Feliciano v. City of Philadelphia, No. 96-cv-6149, 1997 WL 59325 at *5 (E.D. Pa Feb. 11, 1997) and United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)). As a general matter, the Court notes that medical records of treating health care providers are typically admissible under the business records exception to the hearsay rule.  See, e.g., O'Brien v. Int'l Bus. Machines, Inc., Civ. No. 06-4864, 2009 WL 806541, *5 n.10 (D.N.J. Mar. 27, 2009); Tenney v. City of Allentown, Civ. No. 03-3471, 2004 WL 2755538, *1 (E.D. Pa. Nov. 30, 2004) (citing Fed. R. Evid. 803(6); Clemmons v. Delo, 177 F.3d 680, 685 (8th Cir. 1999) (en banc)). Plaintiff has neither disputed that the relevant medical providers treated him for his injuries during this time period nor that they evaluated him on the dates reflected in their records.  The Court further notes that to the extent Defendant relied on any documents in deciding to terminate him, such documents are admissible to demonstrate the state of mind of Defendant's personnel in making that decision, a critical factor in employment discrimination cases. See, e.g., Hardie v. Cotter & Co., 849 F.2d 1097, 1101 (8th Cir. 1988) (holding that documents were properly admitted to establish plaintiff's supervisors' understanding of the circumstances existing at the time of his discharge); Jones v. Univ. of Pa., Civ. No. 00-2695, 2003 WL 21652083, *4 n.3 (E.D. Pa. Mar. 20, 2003) ("[S]o long as complaints received by an employer are offered to show the state of mind of the employer (a crucial factor in discrimination cases), and

not offered to prove the truth of the matter asserted, such complaints do not constitute hearsay.")

As for Exhibit V, it is a form completed by Plaintiff himself and therefore admissible.  Fed. R. Evid. 801(d)(2); United States v. Fleming, 287 Fed. Appx. 150, 154 (3d Cir. 2008), cert. den'd, 129 S.Ct. 477 (2008).

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.  An appropriate Order shall issue herewith.


Dated: December 21, 2011            s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    United States District Judge